**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**GEORGE'S INC., CAMPOS FOODS, LLC,**                                     **PLAINTIFFS**
**and GEORGE'S PREPARED FOODS, LLC**

**V.**                                          **CASE NO. 5:20-CV-05086**

**LLOYD'S OF LONDON SYNDICATE 4000**
**ISSUING CERTIFICATE NUMBER**
**CPP1877167 and PEMBROKE MANAGING**
**AGENCY**                                                                **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendants Lloyd's of London Syndicate 4000 Issuing Certificate Number CPP1877167 ("Underwriters") and Pembroke Managing Agency ("Pembroke") (collectively, "Defendants") have filed a Motion to Dismiss (Doc. 23) pursuant to Federal Rule of Civil Procedure 12(b)(6) seeking dismissal of the claims filed against them by Plaintiffs George's Inc. ("George's"), Campos Foods, LLC ("Campos"), and George's Prepared Foods, LLC ("George's Prepared Foods") (collectively, "Plaintiffs"). Alternatively, Defendants seek transfer of this action to the Southern District of New York pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406. Plaintiffs filed a Response (Doc. 31), and Defendants replied (Doc. 36). The matter is now ripe for consideration. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Doc. 23).

## I.   BACKGROUND

The following facts are taken from Plaintiffs' Amended Complaint (Doc. 13) and are assumed to be true. Campos—a wholly-owned subsidiary of George's Prepared Foods—operates a food processing facility ("the Facility") in Caryville, Tennessee that

makes ready-to-eat ("RTE") sausage patties.   On April 24, 2019, the USDA informed

Plaintiffs of a positive salmonella test at the Facility (Doc. 13, p. 7).   Plaintiffs began an

investigation and paused distribution of potentially affected product.   *Id.*   The USDA also

continued to investigate the contamination.

Around June 10, 2019, Plaintiffs realized that substantial amounts of their product

were likely contaminated by salmonella and would not be released for distribution.   *Id.*

Plaintiffs allege that their investigation concluded that the contamination was likely caused

by employee error and a "temporary failure" of the Facility's "salmonella lethality

processes."   *Id.*   Prior to June 10, Plaintiffs did not know whether their product would need

to be condemned or withdrawn from the market.   *Id.*   Ultimately, based upon their

investigation and a recommendation from the USDA, Plaintiffs condemned over one

million pounds of the RTE patties and issued a voluntary Class I recall.   *Id.* at p. 8.

Plaintiffs put their incurred losses at $3,040,460.86.   *Id.* at p. 9.

Plaintiffs were insured from recall losses pursuant to two policies issued by

Underwriters.   The 2018 Policy—Certificate No. CPP1877167—covered the period from

August 31, 2018 through August 31, 2019.   That Policy provided up to $10,000,000 in

coverage to Plaintiffs "for all or any **Loss** caused by or resulted from any **Insured Event**

first discovered during the **Period of Insurance** and notified to **Underwriters** . . . ."   (Doc.

13-1, p. 3 (emphasis in original)).   The 2018 Policy includes the following applicable

provisions relating to coverage:

- "Loss" is defined as pre-recall and recall costs "which are in fact incurred by
  the **Insured** within 12 months following the date when the relevant **Insured
  Event** was first discovered by the **Insured**."   *Id.* at p. 3 (emphasis in
  original).

- "Insured Events" include, as defined, "Accidental Contamination" and "Governmental Recall."  *Id.*

- The notice provisions of the Policy hold that "[u]pon first discovery of incident that may be covered under the terms of this **Policy** and as a condition precedent to coverage, the **Insured** shall as soon as practical but in no case later than 30 days after discovery . . . (a) provide written notice of any **Insured Event** first discovered by the **Insured** during the **Period of Insurance** . . . ."  *Id.* at p. 12.

The 2018 Policy also includes a choice-of-law provision which states that "[u]nless otherwise agreed, the construction, interpretation and meaning of the provisions of this Policy shall be determined in accordance with New York law."  *Id.* at p. 10.  The 2018 Policy does not contain a forum-selection clause.

As for the 2019 Policy, it covers August 31, 2019 to August 31, 2020.  It is generally identical to the 2018 Policy, though it does include a forum-selection clause that reads as follows:

> The Insured and Underwriters expressly agree that all claims and disputes will be brought for adjudication in the Supreme Court of the State of New York in and for New York County or in the United States District Court for the Southern District of New York.

(Doc. 13-1, p. 31).

Plaintiffs made a demand for coverage that Underwriters denied, leading to this action.  The Amended Complaint seeks a declaration that the alleged contamination and recall are an Insured Event and that Underwriters owe Plaintiffs coverage for their losses. (Doc. 13, pp. 9–10).  The Amended Complaint also names Pembroke as a separate Defendant in its role as "managing agent for Syndicate 4000."  (Doc. 13, p. 3).  The Amended Complaint makes the following five claims:  (1) a request for a declaration that Underwriters owe Plaintiffs coverage under the Policies; (2) breach of contract against Underwriters; (3) breach of the duty of good faith and fair dealing against Underwriters;

3

(4) statutory damages and attorneys' fees against all Defendants; and (5) bad-faith denial-of-coverage against all Defendants.  *Id.* at pp. 12–13.  Defendants responded by filing their Motion, in which they raise a series of arguments for either the dismissal or transfer of Plaintiffs' claims.  Defendants also argue that New York law governs the Policies, while Plaintiffs argue that Arkansas law applies.

On September 29, 2020, the Court held a Rule 16 case management hearing where it heard arguments from the parties on all of the issues raised in Defendants' Motion and took the matter under advisement.  After considering the parties' arguments, the Court's ruling is set forth below.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(3) Motion to Transfer

Rule 12(b)(3) states that a party may move to dismiss a case for "improper venue." Fed. R. Civ. P. 12(b)(3).  If a defendant prevails on a Rule 12(b)(3) motion, "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).

The question of whether venue is "wrong" or "improper" is generally governed by 28 U.S.C. § 1391.  *Id.*  That provision states that "[e]xcept as otherwise provided by law . . . this section shall govern the venue of all civil actions brought in district courts of the United States."  *Id.* (quoting § 1391(a)(1) (emphasis added)).  Section 1391 further provides that:

> a civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property

that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).  The Supreme Court has stated that "[w]hen venue is challenged, the court must determine whether the case falls within one of the three categories set out in section 1391(b)."  *Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for Western Dist. of Tex.*, 571 U.S. 49, 56 (2013).  "If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under § 1406(a)."  *Id.*; *see* 28 U.S.C. § 1406(a).

When reviewing a motion to dismiss under Rule 12(b)(3), the Court applies the same standard used for other motions to dismiss.  *Transocean Grp. Holdings Party Ltd. v. S.D. Soybean Processors*, 505 F. Supp. 2d 573, 575 (D. Minn. 2007).  The Court must construe all facts in the light most favorable to the non-moving party, and take the facts alleged in the complaint as true.  *Id.* at 575.  Unlike motions to dismiss under Rule 12(b)(6), however, when ruling on a motion to dismiss for improper venue, the court may consider matters outside the pleadings.  *Spanier v. Am. Pop Corn Co.*, 2016 WL 1465400, at *10 (N.D. Iowa Apr. 14, 2016).  The defendant, as the moving party, has the burden of establishing that venue is improper.  *United States v. Orshek*, 164 F.2d 741, 742 (8th Cir. 1947).

## B.  Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a pleading must provide "a short and plain statement of the claim showing that [the claimant] is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The Court must

accept all of the pleading's factual allegations as true.  *See Ashley Cnty., v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  However, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a [pleading] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.*  In other words, while "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Id.*  Finally, documents necessarily embraced by the pleading—such as "exhibits attached to the [pleading] whose authenticity is unquestioned"—may be considered by the Court without converting a Rule 12(b)(6) motion into one for summary judgment.  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quoting *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012)).

### III. DISCUSSION

### A.  Motion to Transfer

Defendants argue that, due to the forum-selection clause in the 2019 Policy, the Amended Complaint should be dismissed for improper venue pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406.  But a motion to dismiss under Rule 12(b)(3) and § 1406 is not the proper method to enforce a forum-selection clause; instead, the appropriate way to enforce a forum-selection cause is through the doctrine of *forum non conveniens* as

embodied in 28 U.S.C. § 1404(a).  *Atl. Marine Const. Co.*, 134 S. Ct. at 577 ("Atlantic

Marine contends that a party may enforce a forum-selection clause by seeking dismissal

of the suit under § 1406(a) and Rule 12(b)(3).  We disagree.").  Thus, to the extent

Defendants seek transfer based upon the forum-selection clause, that request is

improperly brought under Rule 12(b)(3) and § 1406(a).

The Court will next consider Defendants' argument that this venue is "wrong" or

"improper" under Rule 12(b)(3) and § 1406 regardless of the application of the forum-

selection clause.  Unfortunately for Defendants, this argument is foreclosed by 28 U.S.C.

§ 1391(c)(3), which states that "a defendant not resident in the United States *may be sued

in any judicial district*, and the joinder of such a defendant shall be disregarded in

determining where the action may be brought with respect to other defendants." 28 U.S.C.

§ 1391(c)(3) (emphasis added).  This statute, which other courts have described as the

"alien-venue" rule, has been consistently interpreted as denying nonresident alien

corporations the ability to contest venue.  *See Brunette Mach. Works, Ltd. v. Kockum

Indus., Inc.*, 406 U.S. 706, 714 (1972) (holding that the alien-venue rule is "a declaration

of the long-established rule that suits against aliens are wholly outside the operation of

all the federal venue laws, general and special") (interpreting a prior version of

§ 1391(c)(3)); *In re HTC Corp.*, 889 F.3d 1349, 1360 (Fed. Cir. 2018), *cert. denied*, 139

S. Ct. 1271 (2019) (holding that § 1391(c)(3) denies foreign corporations the right to

challenge venue under Rule 12(b)(3) and § 1406(a)); *Genuine Enabling Tech., LLC v.

Nintendo Co., Ltd.*, 369 F. Supp. 3d 590, 600 n.6 (D. Del. 2019) ("[A]s an alien corporation,

Nintendo (Japan) cannot challenge venue in any district."); *see also* 14D Charles Alan

Wright & Arthur R. Miller, Fed. Prac. & Pro. § 3810 (4th ed. 2020) (observing that the

effect of 28 U.S.C. § 1391(c)(3) is that "an entity formed in a foreign country which does not reside in the United States may be sued in any district").  The Court is persuaded by the rationales set forth in these cases and agrees that § 1391(c)(3) precludes foreign corporations from challenging venue.

At the case management hearing, counsel for Defendants stated that Syndicate 4000 is wholly-owned by Liberty Corporate Capital, which is organized under United Kingdom law and is similar to a United States corporation.  Because the only underwriter is a foreign corporation and there is no evidence that it has its principal place of business in the United States, its residency is disregarded when determining where an action may be brought. Thus, Underwriters' residency is disregarded for venue purposes, and Defendants have presented no other evidence to demonstrate that venue is improper in this division.  Since Defendants have failed to bear their burden of establishing that venue is improper, Defendants' request to transfer or dismiss this action due to improper venue is **DENIED**.

## B.  Arkansas Law Governs Plaintiffs' Claims

Defendants argue that the choice-of-law provision in the Policies requires that Plaintiffs' claims be governed by New York law.  Plaintiffs disagree, arguing that New York has no connection to this dispute.  For the reasons set forth below, the Court finds that the choice-of-law provision is not enforceable and that Arkansas law governs Plaintiffs' claims.

When deciding which law to apply, federal courts siting in diversity apply the forum state's choice-of-law principles; here, that is Arkansas.  *See Simmons Foods Inc. v. Indus. Risk Insurers*, 863 F.3d 792, 797 (8th Cir. 2017) (citation omitted).  Arkansas courts will

enforce a contractual choice-of-law provision provided that the law selected is reasonably related to the contract at issue and does not violate a fundamental public policy of the forum state.  *Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F. Supp. 835, 841 (E.D. Ark. 1996) (collecting cases), *aff'd*, 112 F.3d 513 (8th Cir. 1997).

Here, other than the choice-of-law clause itself, there is no allegation that New York has *any* relationship to the Policies or the parties.  There is no allegation that any of the parties have their principal place of business or headquarters in New York.  Simply put, based upon the pleadings and the documents encompassed therein, the Court can glean no relationship between the Policies and the state of New York.  Under Arkansas's choice-of-law principles, the apparent lack of connection between the Policies and New York is fatal to the enforcement of the choice-of-law provision.

Absent an express choice of law provision, the "most significant relationship" test should be used to determine questions regarding insurance policies. *Hoosier v. Interinsurance Exch. of the Auto. Club*, 451 S.W.3d 206, 209 (Ark. 2014).  Under Arkansas's "most significant relationship" test, "unless some other state has a more significant relationship to the transaction and the parties, the law of the state which the parties understood to be the principal location of the insured risk during the term of policy controls." *Hoosier*, 451 S.W. 3d at 209 (paraphrasing the Restatement (Second) of Conflict of Laws § 193 (1971)).  To determine which state has the most significant relationship to the transaction, courts consider five factors:  "1) the place of contracting; 2) the place of negotiation of the contract; 3) the place of performance; 4) the location of the subject matter of the contract; [and] 5) the domicile, residence, nationality, place of

incorporation and place of business of the parties." *Crisler v. Unum Ins. Co. of Am.*, 233 S.W.3d 658, 660 (citing Restatement (Second) of Conflict of Laws § 188 (1971)).

In the present case, the Court first concludes that the pleadings and the documents encompassed therein suggest that principal location of the insured risk was in Arkansas. On the 2018 Policy Schedule page, the insureds are listed, and their address is listed as "402 West Robinson Avenue Springdale, AR 72765." (Doc. 13-1, p. 2). This address was not altered after George's Prepared Foods and Campos were added as insureds in November 2018, as this same address was also used on the 2019 Policy. *Id.* at p. 23. Given that both Policies state that the insureds are in Arkansas, the Court concludes that the parties understood that the principal location of the insured risk was in Arkansas.

Having determined based upon the pleadings that the principal location of the insured risk was in Arkansas, the Court must next determine if some other state had a more significant relationship to the transaction. The following facts support the application of Arkansas law: George's has its principal place of business in Arkansas, George's Prepared Foods is owned by residents of Arkansas, and Defendants sent their agents to Arkansas to sell the Policies at issue. *See* Doc. 13, pp. 2–4. The countervailing allegation, which lends support to the application of Tennessee law, is that the contamination at issue occurred at the Facility, which is located in Tennessee. Since "[t]he state where the parties initiate and conduct negotiations weighs heavily in Arkansas courts' principal contacts analysis," *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 930 (8th Cir. 1999) (citation omitted), these allegations lead the Court to conclude that Plaintiffs have pleaded sufficient facts to justify the application of Arkansas law to the present claims. That said, a final determination of choice-of-law must await summary

10

judgment, as many of the pertinent factors cannot be resolved without recourse to matters outside of the pleadings.

### C. Plaintiffs Have Adequately Pleaded Coverage Under the Policies

Defendants raise a host of arguments as to why Plaintiffs have failed to plead coverage under the Policies.  These arguments include:  (1) Plaintiffs have not sufficiently pleaded standing; (2) Plaintiffs have not alleged that their losses were covered by the 2019 Policy; and (3) Plaintiffs fail to allege that they have satisfied the notice requirements in the 2018 Policy.  The Court is unconvinced by each of these arguments.

As to standing, the Court finds that Plaintiffs have sufficiently alleged Article III standing.  Here, Plaintiffs have each alleged that they are insured by the Policies (Doc. 13, p. 4).  Further, George's alleges that it "sold and distributed Insured Products that were ultimately rejected by customers due to an Insured Event and has sustained financial loss as a result."  *Id.* at p. 2.  As for George's Prepared Foods, it alleges that it "condemned Insured Products and incurred other expenses and financial losses as a result of an Insured Event."  *Id.*  Campos alleges that it "condemned Insured Products and incurred other expenses and financial losses as a result of an Insured Event."  *Id.* at p. 3.  In sum, Plaintiffs have alleged that they have incurred insured losses, Defendants have refused to pay for those losses, and a decision from this Court would redress Plaintiffs' alleged harm.  These allegations are sufficient to establish Article III standing.

Defendants' second argument is that Plaintiffs' claims under the 2019 Policy should be dismissed because the 2019 Policy would not cover any of Plaintiffs' losses.  In Defendants' telling, Plaintiffs' Amended Complaint alleges that the relevant Insured Event occurred on April 24, 2019, so the 2019 Policy—which went into effect on August

31, 2019—cannot apply to Plaintiffs' claims.  On the other hand, Plaintiffs allege that the voluntary recall occurred in October 2019 when the 2019 Policy was in effect, so it is at least plausible that the 2019 Policy covers some of Plaintiffs' losses.  Of course, further discovery will demonstrate which Policy covers Plaintiffs' alleged losses, but it would be premature to dismiss Plaintiffs' claims brought under the 2019 Policy when those claims have been sufficiently pleaded.

As to Plaintiffs' compliance with the relevant notice provisions in the 2018 Policy, the Court finds that Plaintiffs have sufficiently alleged that they met those requirements. It is true that, under Arkansas law, an insured must strictly comply with an insurance policy notice provision where that provision is a condition precedent to coverage, as it is in the 2018 Policy.  *See Fireman's Fund Ins. Co. v. Care Mgmt., Inc.*, 361 S.W.3d 800, 803 (Ark. 2010).  Further, where the notice provision is a condition precedent, "[t]he insurance company need not show that it was prejudiced by any delays in or lack of notification" to deny coverage based upon failure to give notice.  *Id.*  But the Arkansas Supreme Court has held that "the requirement of an indemnity policy that immediate notice be given of any default is satisfied where notice is given as soon as knowledge is obtained, and the [insured] need not act on mere suspicion." *Nat. Mut. Cas. Co. v. Cypret*, 179 S.W.2d 161, 164 (Ark. 1944) (citation and quotation omitted).

Here, the notice provision in the 2018 Policy, effective from August 31, 2018 through August 31, 2019, states that "[u]pon first discovery of an incident or circumstances that may be covered" the Insured must give notice within "30 days after discovery . . . ." (Doc. 13-1, p. 33).  Plaintiffs allege that while they learned of the first positive test on April 24, 2019, they still needed to investigate further to determine whether

12

an Insured Event had occurred (Doc. 13, p. 7).  They further allege that on June 10, 2019, they reached the conclusion that "substantial quantities of the RTE patties were likely contaminated by salmonella and would not be released for distribution."  *Id.*  Thus, Plaintiffs argue that their 30-day clock started ticking on June 10, not April 24.

In the Court's view, Plaintiffs have plausibly alleged that they did not "discover" an Insured Event until June 10, 2019, at which point they had 30 days to provide notice. Plaintiffs then provided Defendants with notice on July 1, 2019, within the 30-day window. In the Court's view, these allegations are enough to establish at the pleading stage that Plaintiffs complied with the notice provisions in the 2018 Policy.

### D.  The Court Will Dismiss Plaintiffs' Declaratory Action As Duplicative

Defendants also argue that Plaintiffs' declaratory action claim should be dismissed because it is duplicative of the breach of contract claim.  The Court agrees with Defendants.  The Declaratory Judgment Act provides that "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," as long as there is an actual controversy."  28 U.S.C. § 2201(a).  Federal Rule of Civil Procedure 57 further clarifies that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."   "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfied subject matter jurisdiction."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).  Still, "[w]hen a request for a declaratory judgment alleges . . . duties and obligations under the terms of a contract and asks the court to declare those terms breached[, it] is nothing more than a petition claiming breach of

13

contract." *Daum v. Planit Solutions, Inc.*, 619 F. Supp. 2d 652, 657 (D. Minn. 2009) (internal quotation marks omitted).

Here, it does appear that there is overlap between Plaintiffs' claim for breach of contract and their request for a declaratory judgment, such that the claims might be considered duplicative.  In their declaratory judgment claim, Plaintiffs "seek a judicial declaration that the Underwriting Defendants owe coverage to the full limits of the Policy" and that "Underwriting Defendants have improperly denied coverage in this matter." (Doc. 13, p. 10).  Then, in their breach of contract claim, they allege that "Underwriting Defendants have breached their insuring obligations to Plaintiffs under the Policy by their wrongful denial of coverage . . . ."  *Id.* at p. 11.  Both claims allow a prevailing insured to recover the 12% statutory penalty and attorneys' fees, subject to the applicable statutory provisions.  *Cooper v. Gen. Am. Life Ins. Co.*, 827 F.3d 729, 731 (8th Cir. 2016) (noting that statutory penalties and attorneys' fees under Arkansas Code § 23-79-208 are available "where a party is seeking a declaratory judgment"); *Gafford v. Allstate Ins. Co.*, 459 S.W.3d 277, 280 (Ark. 2015) (concluding that § 23-79-208 provides the exclusive remedy to an insured in an insurance-contract action).  Accordingly, the Court finds that the declaratory judgment claim is duplicative of the breach of contract claim, so the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' declaratory judgment claim.  Count I is therefore **DISMISSED WITHOUT PREJUDICE**.

### E.  The Court Will Dismiss Counts III, IV, and V

Defendants seek dismissal of Counts III (breach of the duty of good faith and fair dealing) and V (the tort of bad-faith denial-of-coverage).  Defendants also assert that Count IV (statutory penalties and attorneys' fees) should be dismissed if the other claims

are dismissed.  For the reasons set forth below, the Court agrees that each of these claims should be dismissed.

First, the Court agrees with Defendants that the claim for breach of duty of good faith and fair dealing is identical to the breach of contract claim and should be dismissed as duplicative.  Arkansas does not recognize a "separate contract claim for breach of a duty of good faith and fair dealing."  *Mt. Home Flight Serv., Inc. v. Baxter Cnty., Ark.*, 758 F.3d 1038, 1043 (8th Cir. 2014) (quoting *Ark. Res. Med. Testing, LLC v. Osborne*, 2011 WL 1423993, at *6 (Ark. 2011)).  Plaintiffs concede this point in their briefing (Doc. 31, p. 25).  Thus, Count III fails as a matter of law and is **DISMISSED WITHOUT PREJUDICE**.

Second, as to the bad-faith denial-of-coverage claim, Defendants argue that Plaintiffs have failed to chin Arkansas's high bar for pleading such a claim.  The Court agrees.  The tort of bad faith is limited to an "insurer who actively engaged in dishonest, malicious, or oppressive conduct in order to avoid its liability."  *Findley v. Time Ins. Co.*, 573 S.W.2d 908, 909 (Ark. 1978).  "The tort of bad faith does not arise from a mere denial of a claim; there must be affirmative misconduct."  *Unum Life Ins. Co. of Am. v. Edwards*, 210 S.W.3d 84, 88 (Ark. 2005) (citation omitted).  The Arkansas Supreme Court has colorfully described its bad faith jurisprudence as follows:

> [W]e have held that nightmarish red tape, an abrupt attitude evidenced by an insurance representative about higher premium costs following cancellation of a group policy, and confusion over the referral process did not amount to bad faith. Nor did the fact that an insurance company waited three months to investigate a claim.

> Examples of cases where we have found substantial evidence of bad faith include where an insurance agent lied by stating there was no insurance coverage; aggressive, abusive, and coercive conduct by a claims representative, which included conversion of the insured's wrecked car; and where a carrier intentionally altered insurance records to avoid a bad risk.

15

*State Auto Prop. & Cas. Ins. Co. v. Swaim*, 991 S.W.2d 555, 561 (Ark. 1999) (internal citations omitted).

Plaintiffs' bad-faith claim is supported by the following allegations: (1) the Policies were marketed by Defendants as covering the exact types of losses at issue here—recall costs—and now Defendants have "intentionally misconstrued basic facts of the Insured Event to wrongfully deny the Loss," (Doc. 13, p. 13); and (2) Defendants denied coverage by "misconstru[ing] statements in a report provided by Plaintiffs . . . ." (Doc. 31, p. 32). Defendants respond that, even taken as true, Plaintiffs' allegations simply do not demonstrate "hatred, ill will, or a spirit of revenge" as required under Arkansas law. (Doc. 36, p. 19 (quoting *Unum Life Ins. Co. of Am.*, 210 S.W.3d at 87 (citation omitted))). Instead, in Defendant's telling, they denied coverage because Plaintiffs willfully ignored the causes of the alleged contamination.

While the Court recognizes that it may infer actual malice "from conduct and surrounding circumstances," *Aetna Cas. and Sur. Co. v. Broadway Arms Corp.*, 664 S.W.2d 463, 465 (Ark. 1984), and that hard proof of bad faith is rare at the pleading stage, Plaintiffs have not adequately pleaded "dishonest, malicious, or oppressive conduct" by Defendants. Instead, Plaintiffs have simply alleged that, after an investigation, Defendants concluded that Plaintiffs' losses were not covered by either Policy. While Plaintiffs obviously disagree with Defendants' decision to deny coverage, the Court cannot reasonably infer from the allegations before it that Defendants acted with malice when denying coverage to Plaintiffs. Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Count V of the Amended Complaint.

16

Finally, in a footnote, Defendants request dismissal of Count IV, which seeks a 12% statutory penalty pursuant to Arkansas Code § 23-79-208 and attorneys' fees.  The Court agrees that this claim should be dismissed.  The statutory penalty and attorneys' fees under Arkansas Code § 23-79-208 are remedies, not separate causes of action.  *See Gafford*, 459 S.W.3d at 280 (describing the attorneys' fees in § 23-79-208 as a "statutory remedy").  Much like punitive damages, it is unnecessary to allege the statutory remedies under § 23-79-208 as a separate cause of action.  Thus, the Court **DISMISSES WITHOUT PREJUDICE** Count IV of the Amended Complaint.

### F.  Pembroke Is Dismissed

Defendants argue that Pembroke must be dismissed because it was not a party to either Policy and instead only acted as "managing agent that manages Syndicate 4000." (Doc. 24, p. 31).  Defendants also assert that Pembroke was never in privity of contract with the Underwriters and therefore cannot be liable for breach of either Policy.  Plaintiffs retort that Defendants are putting forth facts that are outside of the pleadings and that Pembroke is liable because it was an underwriter of the Policies (Doc. 31, p. 39).

Given the Court's rulings already laid out in this Memorandum Opinion and Order, Pembroke must be dismissed.  The Amended Complaint shows that Counts I, II, and III are brought against "Underwriting Defendants," while Counts IV and V are asserted against "All Defendants."  (Doc. 13, p. 10–12).  The Amended Complaint specifically defines "Underwriting Defendants" as "subscribing members of the Defendants Lloyds' of London Syndicate 4000," while Pembroke is defined as "the managing agent for

17

Syndicate 4000." There is no allegation that Pembroke was an underwriter,[1] so the Court declines to construe the Amended Complaint as bringing Counts I, II, and III against Pembroke. In sum, only Counts IV and V are brought against Pembroke, and those claims have both been dismissed. Accordingly, Pembroke is **DISMISSED WITHOUT PREJUDICE**.

## IV. CONCLUSION

For the reasons stated herein, the Court hereby **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 23). Defendants' request to transfer this action to the Southern District of New York pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406 is **DENIED**. Counts I (declaratory judgment and relief), III (breach of the duty of good faith and fair dealing), IV (statutory penalty and attorneys' fees), and V (bad faith) are **DISMISSED WITHOUT PREJUDICE**. Separate Defendant Pembroke Managing Agency is **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED** on this 20th day of November, 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

[1] The Amended Complaint does state that Pembroke Insurance—a non-party—was the "sole underwriter in the Syndicate 4000 . . . ." But Pembroke Insurance's role as an underwriter is irrelevant, as its relationship to Pembroke Managing Agency is unclear.

18